GORSUCH, J., Circuit Judge,
concurring in part and dissenting in part.
I admire and concur entirely in my colleagues’ thoughtful treatment of Ms. Strickland’s FMLA claim, and am pleased to join Parts I and II.A of the court’s opinion. With respect to the gender discrimination claim discussed in Part II.B, I would affirm the judgment of the district court.
To establish a prima facie case of gender discrimination in violation of Title VII, a plaintiff must establish, among other things, that the adverse action complained of occurred “under circumstances which give rise to an inference of unlawful discrimination.” Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1227 (10th Cir.2000) (quoting Texas Dep’t of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Ms. Strickland sought to establish an inference of discrimination from circumstantial evidence — by showing that Mr. Roten treated similarly situated male employees better than her. This, of course, she was entitled *1232 to do. The difficulty is that the record in this case shows that Mr. Roten harassed male employees in very much the same manner as he harassed Ms. Strickland.
In her opening brief, Ms. Strickland devotes her discussion section to arguing that Mr. Roten treated Joe Napikoski, a similarly situated male employee, more favorably than her. But Mr. Napikoski testified that Mr. Roten “manage[d] by fear,” and that “after three or four months of working for Troy [Roten], literally every day I came to work I didn’t know if I was going to leave that day with my job or not.” App. at 43. He further testified that Mr. Roten was a “very demanding manager,” who was “prone to micromanagement” and who “closely monitor[ed]” Mr. Napikoski and accused him of insubordination. Id. at 67-68. In fact, the “entire sales team,” Mr. Napikoski explained, met with Mr. Roten’s boss “just to describe our frustration and give him specific examples of why we felt the way we did.” Id. at 46. Mr. Napikoski didn’t think Mr. Roten was singling him out. Far from it. “I think he probably did this to everybody,” he testified. Id. at 74.[1]
In the discussion section of her reply brief before us, Ms. Strickland shifts course. Perhaps recognizing the difficulty of claiming that Mr. Napikoski received more favorable treatment from Mr. Roten, Ms. Strickland asks us to consider Paul Deaton. Ms. Strickland argues, and my colleagues agree, that Mr. Deaton “had worse sales numbers [than Ms. Strickland], yet he was not subject to the same requirements and oversight as [Ms.] Strickland.” Maj. Op. at 1230. But Mr. Deaton was stationed in Pueblo, approximately fifty miles south of Colorado Springs, and thus had “limited” interactions with the Colorado Springs office where Mr. Roten worked. App. at 171-72. Because Mr. Deaton’s appearances at the Colorado Springs center were infrequent — anywhere between once a month and once a quarter- — -he is a poor yardstick for comparison to Ms. Strickland, who *1233 worked closely by Mr. Roten in Colorado Springs. Id. at 172; see Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir.1997) (“Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline. A court should also compare the relevant employment circumstances ... applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated.”) (internal citation and quotation omitted).
Despite the cushion of distance, however, the record shows that Mr. Roten still subjected Mr. Deaton to much the same harassing oversight he imposed on Ms. Strickland and other employees. Mr. Ro-ten would email and call Mr. Deaton several times a day, and would go on “ride-alongs” with him. App. at 172-73, 175-76. Mr. Roten was a “micromanager,” Mr. Deaton testified, that “just want[ed] details on things” and “would just stay after you constantly.” Id. at 173, 175. Mr. Roten would require Mr. Deaton, like everyone else, to submit weekly calendars, a requirement which Mr. Deaton tried to follow through on so that he “wouldn’t have to go through any crud with [Mr. Roten].” Id. at 174. In the end, Mr. Deaton testified, he was “glad that [he] was south of the Springs,” in Pueblo. Id. at 176. Far from showing that Mr. Dea-ton was a similarly situated male treated more favorably than Ms. Strickland, the record thus shows that, despite not being at the same facility as Mr. Roten, Mr. Deaton was subjected to the same harassing style of management as Ms. Strickland.[2]
Given all this, the record could certainly suggest to a reasonable factfinder that Mr. Roten treated Ms. Strickland poorly in retaliation for her decision to exercise her FMLA rights (as the plaintiff argues and we hold today), or that Mr. Roten was a difficult and unpleasant manager to males and females alike (bad for business, but not legally actionable either), or perhaps that Mr. Roten treated Ms. Strickland as he did because she performed poorly (as the defendant claims). What’s missing from the record, however, is any evidence suggesting that Mr. Roten treated Ms. Strickland less favorably than any other male employee he supervised.
Certainly, as the court rightly notes, we held in Pitre v. Western Elec. Co., Inc., 843 F.2d 1262 (10th Cir.1988), that the fact that similarly situated males were treated just as poorly as a female plaintiff, or the fact that other women were treated more favorably than the plaintiff, does not necessarily “preclude the district court from finding a statutory violation.” Id. at 1273. But this undisputed principle does not obviate the requirement that Ms. Strickland come forth with some direct or circumstantial evidence suggesting that Mr. Roten’s treatment of her arose “under circumstances which give rise to an inference of unlawful discrimination.” Kendrick, 220 F.3d at 1227 (quoting Burdine, 450 U.S. at 253, 101 S.Ct. 1089). Such evidence was plentiful in Pitre, where the class plaintiffs offered statistical evidence that women *1234 suffered a disproportionate number of downgrades within the defendant-company; statistical evidence of a clustering of women at lower-paying salary grades; evidence that management personnel who made promotion and demotion decisions held discriminatory attitudes towards women; evidence that the management personnel acted upon those attitudes through beneficial treatment for men in promotion and demotion decisions and through harassment of women; and testimony from several women regarding instances of sexual harassment. Pitre, 843 F.2d at 1268-70. The difficulty for Ms. Strickland is that any such evidence of discrimination on the basis of gender is absent in her case.

. The majority points to Joe Napikoski’s statement that, "I know [Mr. Roten] treated Carole differently than he treated us.” Maj. Op. at 1231 n. 6. But this statement followed a lengthy discussion by Mr. Napikoski of how differently Ms. Strickland was treated when she came hack from FMLA leave. Mr. Napiko-ski was asked if, when Ms. Strickland returned from her leave, "she [was] treated differently than before she went out on leave?” To which he replied, unequivocally, "Yes.... The effort was to, in my opinion, was to, you know, make or break, you know, provide so much additional stuff that she had to do, and so much torment that she would just eventually walk out.... It was almost like they were mad that she had taken advantage of the company by taking some time off with pay. It's almost how dare you.” App. at 51-52; see also id. at 53. That Mr. Napikoski would, shortly after this discussion, state that Ms. Strickland was treated differently than other employees is simply consistent with her claim that she was retaliated against for taking FMLA leave. It does not, taken in context, suggest that her mistreatment occurred "under circumstances which give rise to an inference of unlawful discrimination” on the basis of gender. Kendrick, 220 F.3d at 1227 (quoting Burdine, 450 U.S. at 253, 101 S.Ct. 1089).
Underscoring this point, Mr. Napikoski testified that two other males and one other female from their group took FMLA leave. He explained that the two males who took leave for stress-related reasons, like Ms. Strickland, were both treated very unfavorably on their return. App. at 58-59. Meanwhile, the female took leave because she was pregnant, and it was "very clear” to Mr. Na-pikoski that "it was a total different situation whenever someone went out on FMLA for a pregnancy.... [I]t was very seamless.” He continued: "it was totally different if you happened to go out on FMLA for work stress related situations.” Id. at 59. Viewed in its entirety, Mr. Napikoski’s testimony thus surely suggests Mr. Roten discriminated against those who took FMLA leave for stress-related reasons he considered inappropriate, but it simply does not support any reasonable inference of discrimination on the basis of gender.

. In her reply brief, Ms. Strickland summarily states, in one sentence, that Don Stephas was also a similarly situated male employee who was treated more favorably by Mr. Roten. It is difficult to evaluate this conclusory statement that includes no supporting rationale or citations to the record. MacArthur v. San Juan County, 495 F.3d 1157, 1160-61 (10th Cir.2007) (”[M]ere conclusory allegations with no citations to the record or any legal authority for support does not constitute adequate briefing.”). In any case, the record does reveal that Mr. Stephas, like Mr. Deaton, was situated at a location apart from Colorado Springs (seventy miles away in Denver), and yet was subjected to much the same strict scrutiny from Mr. Roten as Ms. Strickland. See App. at 183-84.