**William E. ELMORE, Plaintiff–Appellant,**

v.

**CAPSTAN, INC., Defendant–Appellee.**

No. 93–3352.

United States Court of Appeals, Tenth Circuit.

June 19, 1995.

---

Victor A. Bolden (Eric Schnapper, Elaine R. Jones, Charles Stephen Ralston and Theodore M. Shaw, NAACP Legal Defense and Educational Fund, Inc., and Pantaleon Florez, Jr., Florez & Frost, P.A., Topeka, KS, on the brief), New York City, for plaintiff-appellant.

Michael W. Merriam, Goodell, Stratton, Edmonds & Palmer, L.L.P., Topeka, KS, for defendant-appellee.

SEYMOUR, Chief Judge, SETH, Circuit Judge, and KANE, Senior District Judge *.

KANE, Senior District Judge.

Plaintiff employee, an African–American, initiated this Title VII action against his employer claiming his discharge for violating a work rule was the result of intentional discrimination based on race. The employee alleged disparate treatment, contending defendant disciplined non-minority employees more leniently for similar conduct. After a two-day bench trial, the district court found that while the employee had established a *prima facie* case of disparate treatment, he had not established this treatment was the result of intentional discrimination based on race. The district court entered judgment in favor of the employer, and the employee appealed.

On appeal, the employee argues reversal is required because the district court's judgment was premised on the erroneous finding that *"no"* evidence of discriminatory animus had been adduced at trial. The employee points to the district court's finding that non-minorities were treated more leniently for similar infractions on the job, as well as its determination that certain of the explanations for the employee's discharge given by the employer were not credible. While we agree such evidence can be the basis from which a trier of fact may infer discriminatory intent, such an inference is not compelled as a matter of law. The ultimate question of whether intentional discrimination occurred is one for the trier of fact—in this case the district court—to decide. The determination is subject to the clearly erroneous standard of review. After reviewing the district court's findings in light of the record before us, we find no clear error. Accordingly, we affirm.

## I. *Facts*

William E. Elmore is an African–American machinist who was hired as a laborer in the sheet metal department of Seymour Foods, Inc. ("Seymour") in November of 1986. Elmore was considered by his immediate supervisor to be an average employee who never refused to perform tasks assigned to him and never received a written reprimand about either his performance or his attendance at Seymour. *Elmore v. Capstan,* No. 92–4004–DES, 1993 WL 290259, at *2 (D.Kan. July 8, 1993). Nevertheless, Seymour fired Elmore on December 19, 1990,

* Honorable John L. Kane, Jr., Senior United States District Judge for the District of Colorado, sitting by designation.

purportedly for failing timely to notify his supervisor of an extended absence due to illness, as well as for falsifying his return-to-work slip. Elmore filed his Complaint in this action on January 6, 1992, naming Seymour as defendant. Seymour, in conjunction with a sale of assets in October 1992, later changed its name to Capstan, Inc. ("Capstan") and Capstan was substituted as the party defendant in this action.

The dispute between Elmore and Capstan began on Saturday, December 8, 1990, when Elmore became sick with what was eventually diagnosed as an upper respiratory infection. His last day at work was Friday, December 7, 1990. The following day, Saturday, December 8th, Elmore fell ill and elected not to work an overtime shift. He was not scheduled to work Sunday, December 9th.

Elmore was still ill on Monday, December 10th, and made an appointment to see his physician Dr. Cohen on Tuesday, December 11th. Dr. Cohen diagnosed Elmore's illness as a respiratory infection and prescribed a five-day supply of cough medicine and an antibiotic. He also gave Elmore a slip authorizing him to return to work on Friday, December 14, 1990. Elmore's first contact with Capstan regarding his illness and absence from work was on Wednesday, December 12, when his wife called supervisor Gary Thompson to advise him her husband was ill. At that time, Elmore's wife indicated Elmore would probably be back to work on Friday, December 14th.[1]

Elmore did not return to work on Friday. Instead, Elmore's wife went to Dr. Cohen's office to request an extension of time for Elmore to be off work because Elmore still was not feeling well. Dr. Cohen wrote out a new return-to-work slip, permitting Elmore to return to work on December 17, 1990, the following Monday. Elmore did not return to work until Wednesday, December 19. On that day, Elmore submitted the return-to-work slip signed by Dr. Cohen. The date on the slip had been altered from December 17 to December 19 by changing the number "7" to a "9."

Elmore was not permitted to work on December 19th. Instead, supervisor Thompson told him the new operations manager, Don Appleby, would have to be consulted.[2] Appleby told Elmore he had violated company policy by failing to call in and by altering the date on the return-to-work slip. Elmore was asked to go home and await the company's investigation and decision with regard to his absence. After a telephone conversation with Dr. Cohen, in which Dr. Cohen stated he had only authorized Elmore to be off work until December 17th and had not altered the return-to-work date on the slip to December 19th,[3] Appleby consulted with Elmore's supervisors and made the decision to terminate Elmore's employment. At 2:00 p.m. on December 19th, Elmore was notified that his employment was terminated for failure to comply with company policy regarding his absence and for falsifying the date on the return-to-work slip issued by Dr. Cohen.[4]

1. The only other contact with Capstan made by Elmore or his wife during Elmore's illness was on Thursday, December 13. Elmore called Larry Ledom, a non-supervisory employee at Capstan responsible for the company's payroll, and asked to be paid earlier than the regular Friday payday. Elmore was told at that time that he would have to produce a doctor's slip in order to return to work. On that same day, Elmore's wife picked up his paycheck.

2. Don Appleby began working for Capstan as its operations manager on December 11, 1990.

3. Dr. Cohen testified that when he changes a return-to-work date, his practice is to issue a new form with the new date rather than alter the date on the original slip.

4. Seymour's policy on absenteeism provided that employees would be considered to have voluntarily terminated their employment if they failed to call in for three successive days to report an absence and to request that the absence be recorded as "excused." An employee's failure to notify his supervisor after the second day of absence was classified as a serious offense to be disciplined with termination. An absence was excused under Seymour's policy if it was documented by a doctor. An absence was recorded "unexcused" unless the employee requested approval in advance, or, if the absence was due to family or personal illness, jury duty, or other acceptable reason, the employee called in to report such absence between 7:00 and 8:30 a.m. on the date of the absence. Unexcused absences would result in disciplinary action depending upon the number of unexcused absences occurring within a 12–month period. It was permissi-

Elmore asserts Capstan fired him because of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e–2(a)(1).[5] Citing other incidents at Capstan involving serious violations of company policy, Elmore argued that non-minority employees were subject to more lenient discipline for comparably classified offenses. He referenced incidents at Capstan where non-minority employees were disciplined for falsifying company records and for excessive absenteeism who, instead of being fired, were given written warnings about the possibility of termination if the unacceptable conduct occurred again. Elmore presented no evidence, however, that such employees had been absent without prior notice or company approval for seven consecutive work days, or that they had altered a doctor's return-to-work slip.

■ Applying the three-pronged framework established in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the district court determined first that Elmore had established a *prima facie* case of disparate treatment at trial by showing (1) he was a member of a protected class; (2) he was discharged for violating a work rule; and (3) non-minority employees were subjected to more lenient discipline for infractions classified as comparable in seriousness.[6] *Elmore v. Capstan*, 1993 WL 290259 at *4 (D.Kan. July 8, 1993). Second, the district court determined Capstan had met its burden of producing evidence of facially legitimate, nondiscriminatory reasons for Elmore's discharge in that Elmore failed to comply with company policy regarding absences from work and appeared to have altered his return-to-work slip. *Id.* Finally, the district court found Capstan's non-discriminatory reasons for discharging Elmore were not a pretext for racial discrimination, and concluded Elmore had failed to carry his ultimate burden of establishing his discharge was the result of intentional discrimination based on his race. *Id.* at *5.

II. *Analytical Framework*

■ To prevail on a claim of wrongful discharge based on race under Title VII, plaintiff has the ultimate burden of proving, either directly or indirectly, that his discharge was motivated by racial bias. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Where there is inadequate direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation), the United States Supreme Court has established a three-step burden-shifting format whereby plaintiff may prove his case through indirect, i.e., circumstantial, evidence. *McDonnell Douglas*, 411 U.S. at 801–05, 93 S.Ct. at 1824–25; *Burdine*, 450 U.S. at 252–56, 101 S.Ct. at 1093–95. It is well settled in this circuit that the *McDonnell Douglas* format is applicable to the analysis of Title VII claims of disparate treatment. *Sanchez v. Philip Morris, Inc.*, 992 F.2d 244 (10th Cir.1993); *EEOC v. Flasher*, 986 F.2d 1312, 1316 (10th Cir.1992).

■ Under the *McDonnell Douglas* analysis, plaintiff has the initial burden of establishing a *prima facie* case of intentional discrimination. The standard in this circuit for doing so on a disparate treatment claim based upon discharge for violation of a work rule is set out in detail in *Flasher*. There we held a plaintiff may establish a *prima facie* case of disparate treatment by showing (1) he is a member of a protected class; (2) he was discharged for violating a work rule;

---

ble at Seymour for a sick employee to have his spouse call in on his behalf.

**5.** Section 703(a)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), provides: "It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...."

**6.** Elmore asserts a disparate treatment, as opposed to a disparate impact, claim. A disparate impact claim alleges that an ostensibly neutral policy or practice has a disparate impact or effect on a protected class. *See Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) for a discussion of the differences between the two theories.

and (3) similarly situated non-minority employees were treated differently. *Flasher*, 986 F.2d at 1316 (citing *McAlester v. United Air Lines*, 851 F.2d 1249, 1260 (10th Cir. 1988)). When comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of "comparable seriousness." *Id.* (citing *McAlester*, 851 F.2d at 1261).

■ Once plaintiff establishes a *prima facie* case, the burden of production shifts to defendant to articulate a facially nondiscriminatory reason for its employment action. *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1825, *modified by Flasher*, 986 F.2d at 1316, n. 4 (emphasizing that defendant's proffered reason need be only "facially" nondiscriminatory because no examination of whether the reason given is pretextual or unequally applied is made at this stage of the analysis). The proffered reason for the employer's action, however, must be reasonably specific and clear. *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096.

■ Once defendant has met its burden of production by articulating a facially nondiscriminatory reason for its employment action, plaintiff then assumes the normal burden of any plaintiff to prove his or her case at trial. *Flasher*, 986 F.2d at 1316. Plaintiff can prevail

"either directly by proving the employer acted with a discriminatory motive or indirectly by showing the stated reason for the discharge was a 'pretext for the sort of discrimination prohibited by [Title VII]'— that is, that the facially nondiscriminatory reason was 'a cover-up for a racially discriminatory decision.'"

*Id.* To do so the employee need neither prove his employer's proffered reasons were false, nor that a discriminatory factor was the "sole motivating factor in the employment decision." *See James v. Sears, Roe-*

*buck & Co., Inc.*, 21 F.3d 989, 992 (10th Cir.1994) (citations omitted) (applying the *McDonnell Douglas* analysis in a constructive discharge action brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621). Instead, the employee must prove only that a discriminatory factor was "also a reason for the employer's decision" and that it was "the factor that made a difference." *Id.* Finally, in a disparate treatment case, pretext may be shown by reference to other similarly situated non-minority employees receiving disparate discipline. *See McAlester*, 851 F.2d at 1261. In the final analysis, "the court is required to weigh all the evidence and to assess the credibility of the witnesses in order to determine whether the plaintiff was the victim of intentional discrimination based upon protected class characteristics." *Flasher*, 986 F.2d at 1317.

■ The ultimate factual determination of whether the employer's decision was motivated by intentional discrimination based upon protected class characteristics is for the trier of fact. *Id.*, (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982)). Consequently, with respect to the Title VII liability dispute raised on appeal, we are left with the "single overarching issue whether plaintiff adduced sufficient evidence to warrant [the trier of fact's] determination that adverse employment action was taken against him on the basis of [race]." *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 744 (10th Cir.1991), *applied in Sanchez* 992 F.2d at 246.[7]

■ We review the district court's findings under the clearly erroneous standard. *Id.* (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) and *Pitre v. Western Electric Co.*, 843 F.2d 1262, 1266 (10th Cir. 1988)). Under this standard, we may uphold any determination falling within a "broad range of permissible conclusions." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400,

---

7. This is so because the purpose of the sequential burden-shifting analysis adopted from *McDonnell Douglas* is to provide a basic "order of presentation of proof" so the controversy can be brought into focus. *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir.1987). It was not intended to provide a ritualistic formula for what ultimately is a straightforward trial about motive. Thus, after a full trial on the merits, the sequential burden-shifting analysis adopted from *McDonnell Douglas* "drops out" of consideration. *See Sanchez*, 992 F.2d at 246.

110 S.Ct. 2447, 2458, 110 L.Ed.2d 359 (1990). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511–12. "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all the evidence, [the court] is left with the definite and firm conviction that a mistake has been made." *Cowles v. Dow Keith Oil & Gas, Inc.*, 752 F.2d 508, 511 (10th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 74, 93 L.Ed.2d 30 (1986).

### III. *Legal Analysis*

We find the district court correctly applied the three-part analysis applicable to Title VII disparate treatment claims articulated in *McDonnell Douglas* and *Flasher*. The district court first determined Elmore had established a *prima facie* case of disparate treatment, finding non-minority employees were subjected to more lenient discipline, such as verbal and written warnings, for infractions that were comparable in seriousness under Capstan's rules of conduct. *Elmore v. Capstan*, 1993 WL 290259 at *4. Next, the district court found Capstan had articulated a facially nondiscriminatory reason for Elmore's discharge by presenting evidence that Elmore failed to call in sick until the third day of his absence and submitted a falsified return-to-work slip a week later when he finally did return to work.

■ On the ultimate question of whether Elmore had proven his discharge was motivated by intentional discrimination based on race, the district court found that he had not, concluding Elmore had "submitted no evidence whatsoever that his discharge was motivated by racial discrimination." *Id.* at *5. The court allowed that Elmore's termination may have been unfair in light of the lenient treatment afforded other employees who violated similar work rules; it concluded, however, that evidence of disparate treatment alone does not establish a claim of racial discrimination. *Id.*

On appeal, Elmore contends the conclusion that he had presented "no evidence whatsoever" of discriminatory intent is erroneous given the district court's simultaneous finding—made in the context of considering whether Elmore had established his *prima facie* case—that non-minority Capstan employees were disciplined less harshly than comparable infractions of work rules than he. Elmore argues the district court erroneously held that evidence of disparate treatment could not constitute evidence of intentional discrimination. This is a mischaracterization. The district court clearly stated that Elmore had not met his burden of *"persuasion"*, not production. *Id.* at *5 (emphasis added). Thus, the court's subsequent statement that there was "no evidence" Elmore's discharge was "motivated" by racial discrimination was not a determination by the court that there was no evidence from which a trier of fact could infer racial discrimination. Rather, it was a determination that the evidence failed to persuade the district court, sitting as trier of fact, that such an inference was warranted.

The record shows the district court considered the evidence of dissimilar treatment presented by Elmore throughout its analysis. It first considered this evidence when it found Elmore had established his *prima facie* case. *Id.* at *4. It considered this evidence again, along with the other evidence presented, when it made the ultimate factual determination that Elmore had failed to prove intentional discrimination. *Id.* at *5.

■ Elmore argues unexplained differences in treatment should compel a finding of intentional discrimination or pretext. It is error, however, "to assume ... that differential treatment between a minority employee and a non-minority employee that is not explained by the employer in terms of a rational, predetermined business policy must be based on illegal discrimination because of an employee's protected class characteristics." *Flasher*, 986 F.2d at 1319–20. Irrational differential treatment may in some instances support an inference of racial discrimination, upon an appropriate record. *Id.* at 1320. "However, such a conclusion is not compelled as a matter of law". *Id.* In *Sanchez v. Philip Morris, Inc.*, we explained that

"because the *prima facie* case only creates an inference of unlawful discrimination, some evidence that the articulated legitimate business reason for the decision was pretextual does not compel the conclusion that the employer intentionally discriminated. [citing *Flasher.*] *If a plaintiff successfully proves that the defendant's reasons are not worthy of credence, the plaintiff must still prove that the true motive for the employment decision violates Title VII.*"

992 F.2d at 247 (emphasis added). In this case, the district court found Elmore had failed to prove unlawful discrimination was the "true motive" for his discharge.

■ In *Flasher,* we noted that differences in treatment may be attributed to the fact discipline was administered by different supervisors. 986 F.2d at 1320. The district court alluded to this observation in its Memorandum and Order. *Elmore,* 1993 WL 290259 at *6 n. 8. Appleby became the new operations manager on December 11, 1990, the second day of Elmore's absence. Appleby stated at trial that other employees had been treated differently by other supervisors, and that an employee under his supervision who violated company rules would be terminated regardless of the employee's race.[8]

Elmore has never disputed that Appleby, as his direct supervisor, had the authority to fire him. That Appleby, a manager new to his position, wished to achieve a more disciplined operation than other supervisors had established does not compel an inference that the disparities in the treatment of Elmore and others were racially motivated, irrational or lacking in credibility. Based on all the evidence, the district court found Elmore had neither established that Appleby's actions were motivated by racial animus, nor persuaded the court that Capstan's proffered reasons for those actions were pretextual or a cover-up for such a motive.[9] We have reviewed the record before us and conclude these findings were not clearly erroneous.

**8.** Elmore argues that the district court erred in prohibiting him from questioning Appleby concerning an incident which occurred two years after Elmore was fired, involving a non-minority employee. Elmore sought to elicit information as to how Appleby disciplined a white employee who had thrown a pipe at another employee. This was classified as a serious offense under the company's Rules of Conduct, as was falsifying company records. Apparently Elmore sought to challenge the credibility of Appleby's assertion that he would fire any employee who violated company rules, regardless of the employee's race. The district court sustained Capstan's objection to the questioning on the basis of relevance. Following the district court's initial opinion of July 12, 1993, Elmore filed a motion, treated by the district court as a motion for a new trial. Elmore asserted the court improperly excluded evidence of disciplinary actions taken by Appleby in the post–1990 time frame. In denying the motion, the district court stated such evidence was irrelevant because the court had already found sufficient evidence of unequal punishment to establish a *prima facie* case of disparate treatment, and because some of the post–1990 discipline evidence concerned violations of work rules clearly distinguishable from Elmore's violations.

Evidentiary rulings of a trial court are reviewed under the abuse of discretion standard. *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1433 (10th Cir.1993). Under this deferential standard of review, the trial court will be reversed only if there is a firm and definite belief that the trial court made a clear error in judgment. *Id.* The district court's determination that the post–1990 incident was cumulative and distinguishable was within its discretion, and does not indicate a clear error in judgment.

**9.** Elmore argues that the district court only considered the motive and conduct of Appleby, the operations manager who fired him, and failed to consider the motives or intent of other supervisors who consulted with Appleby. We disagree.

The district court's finding that Elmore had failed to meet his ultimate burden of persuasion with respect to the existence of a discriminatory motive was not limited to Appleby. The trial court based its findings on the evidence presented at trial, which included the testimony of Elmore's other supervisors. Nothing in the record suggests racial animus by persons other than Appleby that the district court did not consider. Moreover, Appleby was directly involved in the events which culminated in the decision to terminate Elmore's employment and did not blindly rely on the advice of others. To the contrary, he met with Elmore himself, and consulted directly with Dr. Cohen regarding the falsified return-to-work slip. The mere fact that he also consulted with other supervisors does not prove he acted as a conduit for others' intentional discrimination. Finally, the district court found no evidence of racial animus with respect to Thompson or any other Elmore supervisor. It therefore was unnecessary for the district court to consider whether Appleby was a conduit for any of the other supervisor's racial bias because the court did not find any evidence that they had any.

Accordingly, the district court's Memorandum and Order finding in favor of Capstan and entering judgment against Elmore is AFFIRMED.