**Rosemarie L. CRAIG, Plaintiff,**

v.

**OLSTEN HOME HEALTH CARE, Defendant.**

**No. 97–2664–JWL.**

United States District Court, D. Kansas.

April 7, 1999.

James H. Scott, Jr., Kansas City, MO, Harold L. Holliday, III, Holliday Law Firm, Kansas City, MO, for Rosemarie L Craig, plaintiff.

Carl A. Gallagher, Deryl W. Wynn, Paul K. Thoma, Juliann Johnson, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Olsten Home Health Care Inc., defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Rosemarie Craig filed suit against defendant Olsten Home Health Care alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. This matter is presently before the court on defendant's motion for summary judgment (doc. # 30). As set forth in more detail below, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed in its entirety.

## I. Preliminary Matters

The court is compelled to address several serious deficiencies with respect to plaintiff's papers. As an initial matter, plaintiff filed her response to defendant's motion for summary judgment well beyond the March 15, 1999 deadline. Plaintiff's response was initially due on March 1, 1999. Plaintiff moved the court for an extension of time to file her response and, specifically, requested leave to file her response by March 22, 1999. Although the court granted plaintiff's request for an extension, it ordered plaintiff to file her response by March 15, 1999. March 15 came and went without any response from plaintiff and without any request for an additional extension. Three more days passed without word from plaintiff. On March 19, 1999, plaintiff filed her response, albeit without any explanation for ignoring the court's order and without seeking leave to file her response out of time. Perhaps recognizing the inappropriateness of her conduct, plaintiff belatedly filed on March 26, 1999 a motion to extend the time to respond to defendant's motion for summary judgment. Pursuant to D.Kan. Rule 6.1, the motion is untimely. The court would be entitled to deny the motion, strike plaintiff's response and grant defendant's motion for summary judgment as uncontested pursuant to Local Rule 7.4. However, the defendant tac-

itly gave its approval to the late filing by filing a reply to plaintiff's response without addressing the issue. Therefore, and especially because the court does not want to punish plaintiff for the transgressions of her counsel, the court will address the merits of defendant's motion. Accordingly, plaintiff's motion to extend the time to respond to defendant's motion for summary judgment (doc. # 42) is granted.

Despite taking this additional unauthorized time to file her response, plaintiff's response does not conform with the rules governing summary judgment practice in two significant respects. First, plaintiff has failed to specifically controvert defendant's statement of facts. Thus, the local rules of this court state that defendant's facts "shall be deemed admitted." *See* D.Kan.R. 56.1. Second, the majority of exhibits filed in support of plaintiff's response are not proper Rule 56 evidence, as plaintiff has failed to authenticate the documents through supporting affidavits or depositions from persons with personal knowledge of the facts contained in the exhibits. *See* Fed.R.Civ.P. 56(c) & (e); D.Kan. Rule 56.1. These rules are not mere technicalities, but have been adopted in order to ensure a fair procedure for the disposition of summary judgment motions. In an abundance of caution, however, the court has reviewed plaintiff's statement of facts, as well as the plaintiff's deposition, in an effort to ensure that plaintiff is not deprived of her day in court simply because her counsel has not marshaled the evidence in the manner required by summary judgment practice and applicable rules. Her counsel's shortcomings, although not held against the plaintiff in this instance, are not excused. In the future, the court will strictly enforce these rules against a party represented by these attorneys regardless of the consequences to the merits of the case.

## II. Facts[1]

Defendant provides home health care through a managed care delivery network.

1. In accordance with the applicable summary judgment standard, the facts are uncontro-

These services are provided, in part, through a skilled corps of registered nurses. Plaintiff initially sought employment with defendant as a home health nurse in May 1997, but failed the Home Health test given by defendant to prospective employees. Wendy Johnson, a Manager of Clinical Practice for defendant, advised plaintiff that she could take the test again in thirty days. After thirty days had passed, plaintiff returned to defendant. She was given another Home Health test. This time, plaintiff passed the test.

Plaintiff then began her employment with defendant as a home health nurse. Pursuant to company policy, the first ninety days of plaintiff's employment constituted an "introductory" or "probationary" period. During an employee's introductory period, defendant evaluates whether the employee has the appropriate skills and judgment for home care. Defendant's employee handbook expressly provides that an introductory employee may be terminated during the 90–day period without advance notice.

Prior to her employment with defendant, plaintiff had never worked as a home health nurse. Moreover, defendant was aware that plaintiff had no experience as a home health nurse at the time plaintiff was hired. As a home health nurse, plaintiff was responsible for rendering skilled visiting nurse services to elderly patients in their homes. One of plaintiff's duties included proper administration of a Protime test—a procedure that measures the time required for blood clot formation and detects deficiencies in the extrinsic clotting system—and prompt delivery of the blood sample to an appropriate laboratory for analysis. Any delay in delivering the sample to the laboratory for analysis could preclude a health care provider from responding adequately to the development of a clot formation—a potentially lethal condition.

On Friday, July 18, 1997, Susan Stock, one of defendant's case managers, paged plaintiff while plaintiff was making visits to patients. Plaintiff called Ms. Stock, who instructed plaintiff to draw a blood sample from patient # 121330 for purposes of a Protime test. The results of the test would determine whether the patient's prescribed dosage of Coumadin (a blood thinner) needed adjustment. Plaintiff drew the blood sample and took the sample to the laboratory where plaintiff typically brought samples. The laboratory technologist, however, advised plaintiff that she could not process the sample because patient # 121330 was a Medicare patient.[2] Once plaintiff realized that the patient's blood sample could not be processed at the laboratory, she was forced to discard the sample.[3]

Plaintiff testified that she did not know what to do next. Plaintiff went home and attempted to contact the patient's doctor. Although plaintiff knew that the patient's doctor was a "Dr. Sharp," she did not know Dr. Sharp's first name.[4] According to plaintiff, the phone book contained several listings for a "Dr. Sharp." She called one of the doctors listed and reached an answering service. Plaintiff was not sure whether this Dr. Sharp was the patient's doctor. Nonetheless, plaintiff ceased her efforts to contact the patient's doctor because, as she testified, she "wasn't going to go through the phone book and ... call all the Dr. Sharps." Plaintiff did not take any other action on Friday with respect to patient # 121330's Protime test.

___

verted or related in the light most favorable to plaintiff.

2. According to plaintiff, the vast majority of the patients she visited were Humana patients. Thus, plaintiff mistakenly believed that patient # 121330 was a Humana patient and took the blood sample to the Humana laboratory.

3. Apparently, the Protime test must be completed within a certain period of time after the sample is taken.

4. When instructing plaintiff to draw the sample, defendant did not provide plaintiff with the first name of the patient's doctor, and plaintiff had failed to ask defendant for the doctor's full name.

The parties dispute the sequence of subsequent events. Plaintiff testified that on Saturday morning, July 19, 1997, she contacted Joretta McKarnin, a mentor whom defendant had assigned to plaintiff, to seek advice about the Protime test for patient # 121330. According to plaintiff, Ms. McKarnin advised plaintiff that, in the future, she needed to obtain all relevant information when taking an order. Plaintiff further testified that Ms. McKarnin instructed plaintiff to contact the patient's doctor on Monday, July 21, 1997 and advise the doctor that the Protime test had not been completed. Ms. McKarnin, on the other hand, averred that plaintiff did not contact her about the Protime test until Monday, July 21, 1997.

Nonetheless, on Monday morning, plaintiff explained to Ms. Stock that she had taken the sample to the wrong laboratory and that she needed the patient's doctor's full name. Later that day, plaintiff spoke with the patient's doctor, drew another sample from the patient, and took the sample to the appropriate laboratory. None of defendant's managers confronted plaintiff about the incident until her discharge meeting on August 13, 1997.

On August 6, 1997, plaintiff was given a verbal order by Wendy Johnson to change the wound dressing on patient # 121330. Ms. Johnson's instructions to plaintiff included, *inter alia*, to put a duoderm patch on the patient's wound.[5] Upon arriving at the patient's home, plaintiff found a basket of wound care supplies with the patient's name on it. According to plaintiff, the basket of supplies included a duoderm patch, which plaintiff applied to the patient's wound consistent with Ms. Johnson's instructions. In her nursing notes, however, plaintiff inadvertently wrote that she has used a tegaderm patch on the patient's wound, rather than a duoderm patch. In conducting a routine review of medical records, Ms. Johnson reviewed plaintiff's skilled nursing notes for patient # 121330's dressing change. Plaintiff's

notes indicated that plaintiff failed to follow Ms. Johnson's specific instructions regarding the wound dressing orders.

On August 13, 1997, defendant terminated plaintiff's employment.[6] The discharge decision was made by the Managers of Clinical Practice (Wendy Johnson, Jo Denton, Lynn Ganaden and Chris Taddeo) and the Director of Clinical Operations and Services, Jackie Harvey. Mmes. Johnson and Ganaden advised plaintiff that she was being discharged based on her demonstrated lack of nursing judgment skills and her failure to follow orders. They highlighted the Protime incident and plaintiff's failure to follow Ms. Johnson's orders with respect to the wound-dressing change on patient # 121330. Plaintiff urged that she had followed orders for the dressing change on patient # 121330, but that she had simply made an "error of entry" in her paperwork. Plaintiff also advised Ms. Johnson that she had called Ms. McKarnin on Saturday, July 19, with respect to the Protime situation, and that Ms. McKarnin had told her to contact the patient's doctor and redraw the sample on Monday morning. Ms. Johnson averred that she asked Ms. McKarnin about plaintiff's explanation and that Ms. McKarnin told her that plaintiff had not contacted her about the incident until Monday, July 21.

In December 1997, plaintiff filed this suit against defendant alleging that defendant terminated her employment based upon her race, African–American, and her national origin, Jamaican. Defendant now moves for summary judgment on plaintiff's claims.

## III. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the

---

5. Ms. Johnson's instructions to plaintiff reflected the instructions of the patient's doctor.

6. At the time of her discharge, plaintiff was still in her 90–day probationary period.

evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## IV. Discussion

Plaintiff claims that defendant terminated her employment on the basis of her race and national origin. The court analyzes plaintiff's claims under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the summary judgment context, plaintiff initially must raise a genuine issue of material fact on each element of her prima facie case of discrimination. *See Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). Once plaintiff establishes her prima facie case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817; *EEOC v. Flasher Co.,* 986 F.2d 1312, 1317–19 (10th Cir.1992)). If the defendant comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff "to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (citing *Ingels v. Thiokol Corp.,* 42 F.3d 616, 622 (10th Cir.1994)). If the plaintiff proffers such evidence, the motion for summary judgment must be denied. *Id.*

■ The parties dispute whether plaintiff has established a prima facie case of discriminatory discharge. To establish a prima facie case on a claim of discriminatory discharge where, as here, the plaintiff was discharged for the purported violation of a work rule, the plaintiff must show (1) that she is a member of a protected class; (2) that she was discharged for violating a work rule; and (3) that similarly situated

non-minority employees were treated differently. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 (10th Cir.1997) (citing *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir.1992)). Defendant maintains that plaintiff has failed to establish the third element of her prima facie case. As set forth below, the court agrees. Accordingly, because plaintiff has not established a prima facie case of discriminatory discharge, summary judgment in favor of defendant is appropriate.

■ In an effort to establish the third element of her prima facie case, plaintiff compares herself to non–African–American nurses who, unlike plaintiff, received a "second chance" after making a mistake during the course of their employment. Specifically, plaintiff compares her treatment to the treatment received by Annette Brewer, Judy Kobel, Daniel Jones, Cyndi Gray and Laurie Glynn. The record evidence, however, shows that these individuals were not "similarly situated" to plaintiff. Mmes. Kobel, Gray, and Glynn, for example, were not subject to the same standards governing performance evaluation and discipline as plaintiff. *See id.* at 1404 ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standard governing performance evaluation and discipline."). Significantly, these individuals had successfully completed their 90–day introductory period at the time they made mistakes or had performance issues.[7] Jo Denton, a Manager of Clinical Practice for defendant, testified that employees who have completed the introductory period are typically entitled to the benefit of progressive discipline. Ms. Denton further testified that probationary employees (*i.e.*, employees in the 90–day introductory period) may or may not receive progressive

discipline, depending on the situation. Consistent with Ms. Denton's explanation, defendant's employee handbook expressly states that "employees who do not meet the required standards of their individual jobs during the introductory period may be terminated without advance notice." Thus, Mmes. Kobel, Gray and Glynn are not sufficiently similar to plaintiff for purposes of drawing a comparison. *See id.* ("A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." (citations omitted)).

■ Like plaintiff, Ms. Brewer and Mr. Jones were in their introductory period at the time they made mistakes or had performance issues. Unlike plaintiff, these individuals received the benefit of progressive counseling. To assert a claim of disparate treatment, however, plaintiff must show that she was treated differently than other similarly situated employees who violated work rules of *comparable seriousness. See id.* (emphasis added) (citing *Elmore v. Capstan, Inc.*, 58 F.3d 525, 529–30 (10th Cir.1995)). While Ms. Brewer was counseled for "poor documentation," the record reflects that the nature of Ms. Brewer's problem with documentation was nothing more than spelling errors, omissions of words and, at times, illegible handwriting. According to Ms. Denton, who counseled Ms. Brewer, Ms. Brewer's documentation problems did not compromise the safety of patients. Moreover, when Ms. Brewer made a mistake that did compromise patient safety, her employment was terminated immediately.[8] With respect to Mr. Jones, plaintiff has set forth evidence that Mr. Jones, on three occa-

---

7. Nearly six years after she was hired by defendant, Ms. Kobel was counseled for a medication error and for an incorrect dressing change. Ms. Glynn was counseled for late paperwork more than two years after she was hired. Ms. Gray was counseled for late paperwork more than nine months after she was hired.

8. According to Ms. Denton, Ms. Brewer was discharged after she failed to adjust the flow rate of a patient's IV, resulting in a 24–hour dose of penicillin being delivered to the patient over a short period of time.

sions during his probationary period, improperly dressed patients' wounds. Mr. Jones was not discharged for these mistakes. In terminating plaintiff's employment, however, defendant did not rely only on plaintiff's wound-dressing mistake (or notes indicating mistake). Rather, Mmes. Johnson and Ganaden also highlighted plaintiff's "lack of nursing judgment skills" as evidenced by the Protime incident. There is no evidence in the record before the court that Mr. Jones made any mistakes that put a patient's safety at risk. In sum, the court concludes that Ms. Brewer and Mr. Jones are not proper comparators to plaintiff such that an inference of discrimination can be drawn. Without evidence that individuals who committed mistakes of comparable seriousness were treated differently than plaintiff, plaintiff cannot establish her prima facie case. Summary judgment in favor of defendant is appropriate.

██ Even if plaintiff had established a prima facie case of discrimination, she nonetheless has failed to show the existence of a genuine dispute of material fact as to whether defendant's articulated reasons for its decision are unworthy of belief. According to defendant, plaintiff was discharged based on her lack of judgment (as evidenced by the Protime situation) and her failure to follow orders. In support of her pretext argument, plaintiff concedes that she made mistakes in the course of her employment, but urges instead that her mistakes were the result of improper training from defendant. Even if defendant failed to train plaintiff adequately for her position as a home health nurse, this fact, standing alone, does not suggest that defendant's proffered reasons for terminating plaintiff's employment were unworthy of belief. Significantly, plaintiff has not even alleged (much less come forward with evidence) that defendant's purported failure to train her was based on her race or national origin. She simply argues that defendant should have better prepared her before sending her on home visits alone. These circumstances, without more, cannot reasonably be thought to evidence pretext.

Plaintiff next argues that defendant's proffered reasons for her discharge are pretextual because defendant "never wanted to hire plaintiff in the first place." The argument is meritless. In essence, plaintiff attempts to add a sinister element to the circumstances surrounding her initial application for employment. Specifically, plaintiff argues that defendant simply told her she failed the Home Health test, without showing plaintiff her test results. Moreover, defendant apparently could not locate plaintiff's initial employment application when she returned after thirty days to take the test again. Interestingly, however, plaintiff testified in her deposition that she "figured" she probably would not pass the exam because she was suffering from stress in her personal life at the time. In fact, plaintiff testified that she spent "no more than ten minutes" on the test, that she read each question only once and "just answered the questions and turned it in." Moreover, Ms. Johnson expressly suggested to plaintiff that she retake the test after the thirty-day period. In sum, plaintiff's suggestion that defendant never wanted to hire plaintiff is without any foundation.

██ Finally, plaintiff argues that defendant "is not in the business of hiring black nurses" and that defendant discharged plaintiff in an effort to keep a "lily white" staff. Plaintiff attempts to support this observation with statistics. Specifically, plaintiff argues that defendant employed between 15 and 20 registered nurses in 1995; between 15 and 20 nurses in 1996; and between 40 and 50 nurses in 1997. Of these nurses, only three were African–American. While statistical data may create an inference of discrimination, such data may be "so flawed as to render it insufficient to raise a jury question." *Doan v. Seagate Technology, Inc.,* 82 F.3d 974, 979 (10th Cir.1996) (citing *Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746 (10th Cir.1991)), *cert. denied,* 519 U.S. 1056, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997). Statistics taken in isolation are generally not

probative of discrimination. *Id.* (quoting *Jones v. Unisys Corp.,* 54 F.3d 624, 632 (10th Cir.1995)).

 Here, plaintiff's statistical evidence is flawed for two reasons. First, plaintiff's data shows only the number of nurses who were *employed* by defendant during the relevant time period. It fails, however, to show how many individuals, of what race, applied for a nursing position and were not hired by defendant during that period. *See Kuhn v. Ball State University,* 78 F.3d 330, 332 (7th Cir.1996) (in failure-to-promote case, list of persons promoted by University was "next to worthless" without information concerning how many people, of what age, were not promoted). Without knowing whether any individuals in the protected category other than plaintiff applied for the home health nurse position during the relevant period (and, if so, how many), the court is unable to draw an inference of discrimination from plaintiff's evidence. Second, plaintiff's data fails to eliminate nondiscriminatory explanations for the numerical disparity by showing disparate treatment between similarly situated individuals. *See Doan,* 82 F.3d at 979 ("Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext.") (citing *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1456 (10th Cir.1994)). Plaintiff's statistical evidence, for example, fails to compare the qualifications and experience of those individuals outside the protected category who were hired with the qualifications and experience of those individuals within the protected category who were not hired. In other words, in order for plaintiff's data to have probative significance, it would have to demonstrate that any African–American individuals who were not hired had qualifications and experience comparable to the non–African–American individuals who were hired and that the individuals were similarly situated in any other relevant aspects. *See Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 532–33 (10th Cir.1994); *Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746–47 (10th Cir.1991). In light of its significant flaws, plaintiff's statistical sample simply does not permit an inference of race discrimination.

In sum, plaintiff has not come forward with sufficient evidence from which a reasonable factfinder could infer that defendant's proffered reasons for discharging plaintiff are unworthy of belief or that plaintiff's race or national origin was a motivating factor in defendant's decision. Accordingly, the court grants defendant's motion for summary judgment

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's motion to extend the time to respond to defendant's *motion for summary judgment* (doc. # 42) is **granted** and that defendant's motion for summary judgment (doc. # 30) is **granted.** Plaintiff's complaint is dismissed in its entirety.

**IT IS SO ORDERED.**